UNITED STATES *v.* M. V. JENKINS ET AL.

No. 6040.—Invoices dated Vancouver, B. C., Canada,
December 29, 1939, etc.
Entered at Sumas, Wash., January 2, 1940,
Blaine, Wash., October 14, 1940, etc.
Entry Nos. 683–K, 680–E, etc.

(Decided July 10, 1944)

*Paul P. Rao*, Assistant Attorney General (*Joseph A. Howard, Jr.*, and *William J. Vitale*, special attorneys), for the plaintiff.
*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the defendant.

CLINE, Judge: In these cases, consisting of 12 appeals for reappraisement filed by the collector of customs at the port of Seattle, it is claimed that the firebrick involved should be reappraised at higher values than those found by the appraiser. The cases were consolidated for trial.

The appeals relate to the value of firebrick, and, therefore, the following items on the invoices are not involved: "250 Building brick

#201" and "1,000 Building brick #202," covered by reappraisement 138929–A and "40 sacks fireclay" covered by reappraisement 138927–A. Another item not involved is "52 Firebrick shapes" at 28 cents each, covered by reappraisement 138927–A, counsel for the plaintiff having stated that no contention was made as to that item.

At the outset of the trial, counsel stipulated that the value of the item "11,845 Firebrick Special Vacuum Checkers, 9 x 4½ x 3 inches" on the invoice covered by appeal No. 135556–A should be $56 (United States currency), net, per 1,000. The same item appears on the invoices covered by reappraisements 138690-A and 139317–A, entered at $56 (United States currency), net, per 1,000, and, on the basis of that stipulation, I reappraise such merchandise at the value stated.

Other merchandise involved, together with the appraised value, which is the same as the entered value, and the claimed dutiable value of the various kinds of firebrick involved, are set forth in plaintiff's brief as follows:

| Item | Entered and appraised value | Value claimed by collector |
|---|---|---|
| Squares (9 x 4½ x 2½ inches) | $57.50 Can. Cur. | $66.00 Can. Cur. |
| Soaps | 58.50 Can. Cur. | 66.00 Can. Cur. |
| End wedge (#1 and #2) | 58.50 Can. Cur. | 66.00 Can. Cur. |
| Splits (1, 1¼, 1½, and 2 inches) | 58.50 Can. Cur. | 66.00 Can. Cur. |
| Side arch (#1 and #2) | 58.50 Can. Cur. | 66.00 Can. Cur. |
| Neck (#3) | 64.00 Can. Cur. | 66.00 Can. Cur. |
| End skews | 64.00 Can. Cur. | 72.50 Can. Cur. |
| Tongue and groove | 60.00 Can. Cur. | 71.00 Can. Cur. |
| Small X-blocks (9 x 6 x 2½ inches) | 80.00 Can. Cur. | 115.00 Can. Cur. |

All of the values mentioned above are in Canadian currency per 1,000. The entered and appraised values were subject to a deduction of 10 per centum for "commission," but the value which plaintiff claims is net. There does not appear to be any "X-blocks" on the invoices but there is an item of "Firebrick 9 x 6 x 2½ inches" on the invoice covered by reappraisement No. 138927–A which was entered and appraised at $80 (Canadian currency) per 1,000, less commission of 10 per centum, and it is assumed that such item consists of the X-blocks described by plaintiff.

On some of the appeals, namely 138688-A, 138689–A, 138690–A, 138755–A, 138928–A, and 139317–A, the merchandise was entered and appraised in United States currency, net, at the following values:

| | |
|---|---|
| Firebrick squares | $50. 00 per 1, 000 |
| Firebrick side arch #1 | 50. 00 per 1, 000 |
| Firebrick splits 1¼" | 50. 00 per 1, 000 |
| Firebrick soaps | 50. 00 per 1, 000 |
| Firebrick squares, 9" x 4½" x 2½" | 46. 50 per 1, 000 |
| Firebrick splits 1", 1¼", 1½" & 2" | 46. 50 per 1, 000 |

The period covered by the shipments herein involved is from December 29, 1939, to and including April 21, 1941. The private invoices with the papers contain both the value in Canadian currency and in United States currency and all of the merchandise was shipped by the manufacturer—Clayburn Co., Ltd.—f. o. b. Abbotsford, B. C., which is about 5 miles from Kilgard, the place of manufacture, but the invoices were certified at Vancouver, B. C., which is about 50 miles from Kilgard. The record shows that there is no American consul at either Kilgard or Abbotsford.

It was stipulated between counsel that the merchandise should be reappraised on the basis of foreign value.

The plaintiff offered a report of customs agent Horace E. Wager, but objection thereto by counsel for the defendants was sustained and the document was marked exhibit 1, for identification. Thereupon Horace E. Wager was called as a witness for the plaintiff. He testified that, at the request of the collector of customs at the port of Seattle, he made an investigation of the market value of the merchandise covered by the instant appeals and found that the Vancouver dealers kept stocks of merchandise on hand.

It was stipulated between counsel that the various dealers in Vancouver kept stock on hand varying from 5,000 to 70,000 standard firebrick and standard firebrick shapes.

The witness testified further that Clayburn Co., Ltd., supplied him with its standard catalog which contained no prices; that no price lists were published either by Clayburn Co., Ltd., or by the Vancouver dealers, but he obtained lists of prices from Evans, Coleman & Evans, Ltd., McCleery & Weston, Ltd., Champion & White, Ltd., and Thomas G. McBride & Co., all of Vancouver, and from Gilley Bros., Ltd., of New Westminster, B. C., which is about 11 miles from Vancouver; that the prices in the lists were the schedules maintained at the counters of the various dealers and sales were made therefrom; that the sales in the dealers' invoices and books were in keeping with the respective lists, although they were not in each instance identical. The witness produced the following exhibits which were admitted in evidence:

Exhibits 2 to 6, which consist of the lists of prices and extracts made by the witness from sales by Evans, Coleman & Evans, Ltd., McCleery & Weston, Ltd., Champion & White, Ltd., Thomas G. McBride & Co., and Gilley Bros., Ltd.

Exhibit 7, consisting of extracts from sales by the Victoria Tile & Brick Supply Co., of Vancouver.

Exhibits 8-A, 8-B, 8-C, 8-D, 8-E, and 8-F, consisting of extracts from sales by Clayburn Co., Ltd.

Exhibit 9, a photostatic copy of a document, showing the discounts allowed to the various customers of Clayburn Co., Ltd., with the total monthly sales to each concern during the years 1940 and 1941.

Exhibits 10–A and 10–B, consisting of copies of contracts entered into by Clayburn Co., Ltd.

Exhibits 11–A and 11–B, consisting of copies of letters to the Treasury Department, written by Clayburn Co., Ltd., relating to agent's commissions.

Exhibit 12, consisting of extracts of sales by Evans, Coleman & Evans, Ltd., to Allen's Plastic Brick Works and a photostatic copy of a credit bill of Evans, Coleman & Evans, Ltd., against Clayburn Co., Ltd.

Exhibit 13, consisting of a letter written by Clayburn Co., Ltd., to the supervising customs agent at Seattle, dated February 2, 1942.

Exhibit 14, consisting of the catalog of Clayburn Co., Ltd.

On cross-examination the witness testified that he did not record all of the sales of the various dealers in the lists of sales in the exhibits, but made a record of the major portion of the representative sales, and, if the prices were inconsistent, he recorded them; that the jobbers Evans, Coleman & Evans, Ltd., McCleery & Weston, Ltd., Champion & White, Ltd., Thomas McBride, and Gilley Bros., Ltd., gave one price if the purchaser came to the plant for the merchandise and another price if the jobber delivered the merchandise to the purchaser; that the prices in exhibit 2 are the delivered prices to consumers in Vancouver; that exhibit 3 contains prices at which McCleery & Weston, Ltd., delivered firebrick at their plant and not to the purchaser; that exhibit 4 shows prices by Champion & White, Ltd., both delivered from stock and delivered to the purchaser; that exhibits 5 and 6 show whether the sales were consummated on the basis of delivered price to the purchaser's destination.

At the conclusion of the Government's testimony, counsel for the importers moved to dismiss the appeals on the ground that there was a failure to establish prices of firebrick other than the entered and appraised values as defined in section 402 of the Tariff Act of 1930. That motion was taken under advisement at the trial. It is now denied, with exception granted to the defendants.

During the direct examination of witness Wager, he testified that he examined the records of the Provincial Registrar of companies in Vancouver and found that a corporation by the name of Evans, Coleman & Gilley Bros., Ltd., owns a majority of shares in Evans, Coleman & Evans, Ltd., Evans, Coleman & Johnson Bros., Ltd., McCleery & Weston, Ltd., and Gilley Bros., Ltd. Counsel for the defendants objected to that testimony but it was taken subject to being connected up with anything relating thereto in the record. The motion was taken under advisement and is now denied, with exception to the defendants. While the testimony has no importance in the decision of this case, it serves to identify what the witnesses referred to as "Evans Associates" and as "Associated Companies" in exhibit 10–A. That exhibit, which is dated May 1, 1940, is a contract between Clayburn Co., Ltd., and Evans, Coleman & Evans, Ltd., and Associated Companies, incorporated under the laws of the

Province of British Columbia. It is signed by Mr. J. A. Roaf, managing director of Clayburn Co., Ltd., and Mr. W. F. Foster, director of Evans, Coleman & Evans, Ltd. In paragraph 15 of the contract, the names of the "Associated Companies" or "Associates," are given as—

Evans, Coleman & Evans, Ltd., Vancouver, B. C.
Evans, Coleman & Evans, Ltd., North Vancouver, B. C.
Evans, Coleman & Johnson Bros., Ltd., Victoria, B. C.
Gilley Bros., Ltd., New Westminster, B. C.
Diether's Ltd., Vancouver, B. C.
McCleery & Weston, Ltd., Marpole, B. C.

The following are the pertinent parts of the contract:

1. The Clayburn Co. hereby appoints the Evans Co. and Associates its sales agents for the Province of British Columbia with the right within the Province of British Columbia of selling the products of the Clayburn Co. in its business as manufacturers of brick, fire clay, sewer pipe, and other products of clay from the date hereof until the first day of May 1943, upon the terms and conditions hereinafter mentioned.

3. The Clayburn Co. shall deliver the products of the manufacturing plant f. o. b. cars Abbotsford, or f. o. b. trucks of the works of the Clayburn Co. and will so far as reasonably possible fill all orders accepted by the Clayburn Co. promptly on the days and times which may be required and specified by the Evans Co. and Associates. * * *.

5. The Evans Co. and Associates will maintain branches or agencies for the sale of the products of the Clayburn Co. in the cities of Vancouver, Victoria, New Westminster, and North Vancouver, in the Province of British Columbia.

6. The Evans Co. and Associates will in connection with all its advertising of the products of the Clayburn Co. us [use] the word "Clayburn" in connection with such advertisements and products as frequently and prominently as possible, and will advertise as agents and not as sole agents for the Clayburn products.

7. The selling price of the several products of the Clayburn Co. shall be agreed upon between the Clayburn Co.'s managing director and the managers of the Evans Co. and Associates and in default of agreement the selling prices shall be determined by the directors of the Clayburn Co. whose decision in this respect shall be final, and it is understood and agreed that the Evans Co. and Associates shall not increase or vary the prices so fixed without the consent of the Clayburn Co. being first given and confirmed in writing.

8. The Evans Co. and Associates shall be entitled to receive a commission of ten (10) per cent on all sales made by them within the Province of British Columbia. On sales made by the Clayburn Co. direct to its customers in the Province of British Columbia the Clayburn Co. will allow the Evans Co. and Associates a commission of five (5) per cent after said sales have been paid for. No commission will be paid to the Evans Co. and Associates by the Clayburn Co. for sales made direct by the Clayburn Co. to bona fide dealers in building materials.

11. When selling a similar class of goods of other concerns as herein permitted the Evans Co. and Associates covenant and agree that they will not either directly or indirectly sell or cause such goods to be sold at lower prices than the prices at which similar classes of the Clayburn Co.'s goods are to be sold under the terms of this agreement.

13. The Evans Co. and Associates will at their own expense provide the necessary warehouses or storage room for the goods of the Clayburn Co. in Vancouver

or such other place or places as the same may be required elsewhere than at the works of the Clayburn Co. and from which sales may be made at sufficiently increased prices to cover cost of warehousing, handling, and interest, the Evans Co. and Associates to pay the current market prices to the Clayburn Co. for such goods less the agency commission.

As some of the shipments in the instant case were made prior to the date when the contract above referred to went into effect, it will be necessary to consider the terms of a previous contract, dated April 1, 1925 (exhibit 10–B). That contract was between Clayburn Co., Ltd., and Evans, Coleman & Evans, Ltd., of Vancouver. No reference is made therein to Evans Associates. With the exception of paragraph 2, quoted below, the terms of the contract are substantially the same as those in exhibit 10–A.

2. The Evans Co. covenants and agrees with the Clayburn Co. to use its best endeavours to dispose of the products of the Clayburn Co. at the best prices available and agrees that it will not carry or sell or act as agents for the sale of similar lines of goods manufactured by other concerns except to the extent hereinafter mentioned.

The defendants called Mr. John H. Roaf, the managing director of Clayburn Co., Ltd., the shipper of the merchandise in this case, who testified that he supervises the executive end of the business and keeps in touch with the manufacturing; that he offered the articles involved for sale in British Columbia from 1939 to August 1941 and sold squares and straights to dealers in Canada at 57.50 (Canadian currency) per 1,000; that the prices for end wedge, side arch, soaps, and splits were $1 over the base; that he prepared a schedule of prices made from his records. This schedule was offered and received in evidence as exhibit 15. He testified that he would sell to dealers and consumers at the prices shown on the exhibit.

The prices in exhibit 15 are the same as the unit prices on the various invoices but no discounts or commissions are noted thereon. The witness testified that he sold at the basic price on the exhibit to Evans, Coleman & Evans, Ltd., Evans Trading Co., Ltd., McCleery & Weston Co., Ltd., Evans, Coleman & Johnson Bros., Ltd., and Deither's, Ltd., and Gilley Bros., Ltd., and, with the exception of Evans, Coleman & Johnson Bros. of Victoria, he granted those firms a discount of 10 per centum during the entire period; that to Evans, Coleman & Johnson Bros., Ltd., he sold at $2.50 per 1,000 less than to the other dealers which were in the "lower mainland" group.

The witness testified further that article 7 in the contracts or agreements, exhibits 10–A and 10–B, relating to the prices at which Evans and Associates may sell, applies only to deliveries at Kilgard on the base of $57.50 per 1,000 and does not apply to the sales by Evans and Associates from their warehouses; that he sold at the list prices to consumers in wholesale quantities with no discount, but he gave a

discount of 7½ per centum to Champion & White and T. G. McBride; that he sold on a base of $49.50 per 1,000 to the Alberta trade; that Pitkethly were buying in such small quantities that no discount was allowed them; that his firm carries no stock in Vancouver and all orders received in the Vancouver office were shipped from Kilgard. The witness produced copies of invoices of his company and they were received in evidence and marked collective exhibits 16–A, 16–B, 16–C, 16–D, and 16–E. He testified that prices higher than $57.50 in exhibit 16–B covered retail sales.

On cross-examination, the attention of the witness was directed to the paragraph beginning at the bottom of page 1 of exhibit 13, which is a letter signed by himself. The paragraph reads as follows:

In order to avoid price raising or price lowering of our sales prices we require that the dealers do not submit their invoices to the consumer at higher or lower prices than shown on our invoices; in other words the prices as invoiced by our firm to the dealer must be so invoiced by him to the consumer. We do not as a rule invoice the consumer direct except for a few large consumer accounts such as the Canadian Pacific Railroad Co., Consolidated Mining & Smelting Co. and others and for which sales we allow a 5% selling commission.

The witness testified that the above information was correct; that the wholesale price at Kilgard was on the base price of $57.50 per 1,000, but if a stranger came to his plant the price would be $5 higher; that he does not know at what price the dealers in Vancouver sell the merchandise they have in warehouse, but if they sell merchandise on a delivered price at Kilgard they cannot vary the f. o. b. factory price.

The next witness called by the defendants was Mr. W. F. Foster, who is building supplies manager for Evans, Coleman & Evans, Ltd., of Vancouver. He produced copies of invoices covering all of the sales by that firm during the period involved and they were admitted in evidence and marked collective exhibits 18–A, 18–B, 18–C, 18–D, and 18–E. He testified that the invoices cover sales to dealers, industrials, large contractors and small contractors; that there are about 45 lumber yards which he considers to be dealers; that when a customer picks up an article at the wharf by his own truck, the invoice is marked "ex wharf" or "ex warehouse"; that in 1939, 1940, and 1941 the price of Clayburn squares to dealers was $64 per 1,000, f. o. b. Vancouver; that the price to industrials "ex wharf" was $66 per 1,000, but in a great many cases, when an industrial gives an order for a carload, the merchandise would be trucked from Kilgard and delivered at his plant for $64 per 1,000; that small contractors were paying $70 per 1,000 "ex wharf" in pick-up lots, which he designated as retail sales; that a wholesale sale would be one in carload lots; that there are no restrictions as to price at which his company sells f. o. b. "ex wharf" or "ex warehouse," but there is a restriction on carload lots f. o. b. Kilgard, the price being on $57.50 base, net.

On cross-examination the witness testified that if an industrial wanted 200 bricks he would take them at the warehouse and pay $66 per 1,000, but, if he bought a truckload, it would be picked up at Kilgard and he would get an invoice from Clayburn with added cartage and handling; that the $64 price was for large industrials, but some of the small ones might have paid $66 per 1,000 from the works.

On redirect examination the witness was asked and answered the following questions:

R. Q. When you make a sale in a truckload lot do you sell the product which you own or do you merely retain the commission from Clayburn.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

A. When the bricks are on the truck at the works, they are our materials from then on.

R. Q. In the case where you have sold at the works at $57.50 what is your profit?—A. 10 percent.

On recross-examination, the witness was shown the invoice marked exhibit 19 and he testified that it covers a carload lot. An examination of that exhibit shows that it covers 4,400 bricks and 15 sacks of fireclay.

The next witness called by the defendants was Mr. Raymond Francis McCleery who is connected with the firm of McCleery & Weston, Ltd. The witness produced invoices which were copies of representative sales of that firm and they were marked in evidence as collective exhibits 21–A, 21–B, 21–D, and 21–E. He testified that all of the sales are on the basis of price delivered to the purchaser and the prices vary depending on the cost of delivery; that he had never sold f. o. b. Kilgard and there is no agreement whereby McCleery & Weston has to sell their brick at any price contingent upon instructions from Clayburn Co., Ltd.; that he sells to mill operators and bricklaying contractors.

On cross-examination the witness testified that McCleery & Weston, Ltd., is a member of Evans, Coleman & Evans Associates; that he did not know that there was in existence during the period of time covered by the instant importations an agreement such as is covered by exhibit 10–A; that he takes the price from Clayburn as a basis for fixing his price and adds the cost of the cartage and handling charges; that his firm picks up the bricks at Kilgard and delivers them to the industrial plant.

An examination of the various documents submitted shows that there is a considerable disparity in the prices at which the various articles were sold, small quantities in some cases being sold at higher prices than large quantities while in other cases there was no difference in price between the small and the large quantities. Some of the witnesses testified that some of the sales were in retail quantities, so the question immediately arises as to what prices were appli-

cable to the goods in the usual wholesale quantities. This question was the subject of stipulation by the parties. The following appears in the record:

Mr. Vitale. The Government is willing to concede that all the sales that the Government is relying upon in this case are wholesale quantity sales, if that is what Mr. Tuttle is driving at. I mean the ones that we are relying upon are wholesale quantity sales.

Mr. Tuttle. That is somewhat of a question.

Mr. Vitale. It is a question of whether they are sales from Clayburn to the dealers, or dealers to their purchasers. They are wholesale sales. The question is whether the market is a freely offered market.

Mr. Tuttle. Never mind, Mr. Wager, then. · We will stipulate that all the sales covered by the schedules of the dealers, sales by the dealers, or the sales by Clayburn Co. to the dealers, as shown by the exhibits, are all wholesale sales.

Mr.·Vitale. Yes.

It is difficult to understand just exactly what the parties had in mind in making the foregoing stipulation. Attention was directed to it during the examination of witness W. F. Foster. The record reads as follows:

Mr. Tuttle. May I interrupt right there, your Honor? Your Honor will recall that there is a stipulation in the record which embraces the sales by Evans, Coleman & Evans, among others, that all those sales were in wholesale quantities; that includes these.

Mr. Vitale. Oh, well, if that is a stipulation that includes sales to small contractors at retail prices, then the stipulation is absolutely a nullity.

Mr. Tuttle. Do you want it back again? You can have it back.

Mr. Vitale. If I stipulated that sales to the small contractors are in wholesale quantity, and the witness says they are retail prices, then, of course, our stipulation is a nullity. I mean that the wholesale quantities in the wholesale market are all sales in wholesale quantities.

Mr. Tuttle. If I may interrupt, my recollection is that it was stipulated that the sales listed in Mr. Wager's report—

Mr. Vitale. Which one?

Mr. Tuttle. In the whole report, that were offered in evidence, were all in wholesale quantities. If you want to withdraw that stipulation, you can.

Mr. Vitale. All sales in the wholesale market are in wholesale quantities; that is the limit of my admission or my contention. After all, we are not going to admit that sales to small contractors, two bricks or three bricks, are in wholesale quantities; it is not a wholesale market.

For the purpose of determining the usual wholesale quantity in which the merchandise was sold in Vancouver, under the provisions of the stipulation and statements of counsel, I have examined exhibit 2, which was produced by Mr. Wager, consisting of records of sales taken from the books of Evans, Coleman & Evans, Ltd. Many of the records of sales contain a number of items, but, considering only those which contain a single commodity, it appears that the quantity sold to large consumers range as follows: squares, 35 to 15,600; splits, 10 to 300; end wedges, 24 to 1,000; tongue and groove, 300 to 1,000; side arch, 20 to 600; X-blocks, 24 to 1,000. Single

sales to large contractors were in the following quantities: squares, 35 to 2,000; splits, 10 to 90. Sales to dealers were in quantities of from 10 squares to 500. Sales to small consumers were in the following quantities: squares, 12 to 800; side arch, 200; edge skews, 100; tongue and groove, 16; splits 50. Where the sales contained more than one article, the quantities in some cases were less than in the sales containing one class only. For instance, in the sale of August 28, 1940 (page 27 of exhibit 2), the quantity is 16 tongue and groove and 6 splits, and, in the sale of September 3, 1940 (page 29), the shipment covers, among other things, 3 splits 2'' and 3 splits 1½''.

The quantity of the single sales by McCleery & Weston, Ltd. (collective exhibit 3), Champion & White, Ltd. (collective exhibit 4), Thos. G. McBride & Co. (collective exhibit 5), and Gilley Bros., Ltd. (collective exhibit 6), are in substantially the same range as those in the record of sales of Evans, Coleman & Evans, Ltd., but the sales of Thos. G. McBride & Co. contain more transactions of less than 100 squares than the sales of the other dealers. However, the sales of Thos. G. McBride & Co., listed in collective exhibit 5, were all to contracting consumers (bricklayers) and small industrial concerns and the price charged includes the cost of delivery to the purchasers.

The quantities covered by the sales of Clayburn Co., Ltd., of Kilgard, in collective exhibits 8-A, 8-B, 8-C, 8-D, 8-E, and 8-F, are generally larger than those of the dealers above-mentioned but there are sales described in those exhibits within the general range of quantities above-described.

In referring to the quantities of sales covered by the copies of invoices in collective exhibits 18-A, 18-B, 18-C, 18-D, and 18-E, witness Foster stated:

The WITNESS. You cannot treat all of these invoices as a whole. There are some industrial prices that are based on carload lots. You might say that would be a wholesale price. However, if you are buying a half dozen bricks or so—by some industrial—I would not say that is a wholesale lot.

By Mr. VITALE.

Q. Now, you sell these contractors and industrials in lots of 200 or 300 bricks, don't you?

 \* \* \* \* \* \* \*

A. Yes, our contractors—we sell a lot of contractors in that quantity.

By Mr. VITALE.

Q. From 200 to 10,000 brick, is that right?—A. Contractors.

Q. And industrials?—A. Industrials, they buy a larger quantity than a contractor would.

Q. I see.—A. Industrials—I am talking about the big mills, and so forth.

Q. And these invoices [referring to collective exhibits 18-A, 18-B, 18-C, 18-D, 18-E, and 18-F] cover all wholesale quantities, is that right; that is, the ones to the industrials, and industrialists and contractors, they cover only wholesale quantities?—A. These invoices?

Q. Yes.—A. They cover everything.

Although the witness testified, as stated previously, that a sale in carload lots would be a wholesale quantity, I am bound by the stipulation of the parties and I hold that the usual wholesale quantities in which the merchandise was bought and sold in Canada at the various dates of exportation of the merchandise herein involved, were as noted in the records of sales in collective exhibits 2, 3, 4, 5, 6, and 8–A, 8–B, 8–C, 8–D, and 8–E as above described.

An analysis of the statements of prices on the letterhead of Evans, Coleman & Evans, Ltd., dated December 2, 1941 (part of collective exhibit 2) throws some light on the class of transactions which counsel for the plaintiff relies upon for the determination of value of the merchandise herein involved. The exhibit contains three columns of prices, one headed by the word "Dealers," another by the words "Industrials and Large Contractors," and the third by the words "Small Contractors." The prices under the heading "Industrials and Large Contractors" are the same as the unit prices claimed by the plaintiff, except the prices of necks and skews, which prices, according to a statement on the exhibit, include the Canadian sales tax. As the record shows that the merchandise herein involved is not subject to the Canadian sales tax, it is evident that the tax should not be included in the price. A deduction of the 8 per centum sales tax on those items results in prices which are near those claimed by the Government. The prices to dealers on this exhibit are lower than those to industrials and large contractors, and the prices to small contractors are higher. For instance, the price of the squares to dealers is $64 per 1,000, to industrials and large contractors is $66 per 1,000 and to small contractors is $70 per 1,000. Under this list of prices the following appears:

NOTE. The above prices are the delivered prices to consumers in Vancouver, B. C., and include a cartage cost of $2 per ton or $7 per M for trucking from the Clayburn factories at Kilgard, B. C., to consumers Vancouver destination: $2 per M is added for stocking, warehousing, and handling, and cartage for unusual delivery or small lots delivered in the Vancouver area from our local stock.

The prices of McCleery & Weston, Ltd., of Vancouver, as shown in the letter of December 20, 1941 (part of collective exhibit 3) are $65 per 1,000 for squares, end wedges, side arch, soaps; $69 for 1″ splits; and $120 for X-blocks.

The prices of Champion & White, Ltd., of Vancouver, are shown in the following excerpt from a letter dated January 24, 1941, which is a part of collective exhibit 4:

Our sales from January 1, 1940, to August 1, 1941, in quantities from 60 to about 200 squares which are sold to bricklayer contractors for $75 per M when delivery was taken from our stock in Vancouver; $80 per M if we delivered to the contractors destination in Vancouver. * * *.

Thos. G. McBride & Co., of Vancouver, in a letter dated January 19, 1942 (part of collective exhibit 5) gave the same prices as Champion & White, Ltd.

An examination of the records of sales of Clayburn Co., Ltd., shown in collective exhibits 8–A, 8–B, 8–C, 8–D, 8–E, and 8–F, offered by the plaintiff, and the copies of invoices in collective exhibits 16–A, 16–B, 16–C, 16–D, and 16–E, offered by the defendants, shows that the majority of the sales were made to dealers in Vancouver and New Westminster, f. o. b. Kilgard, at the following unit prices in Canadian currency:

| | |
|---|---|
| Squares | $57.50 per 1,000 |
| Soaps and side arch | 58.50 per 1,000 |
| End wedge | 58.50 per 1,000 |
| Splits 1¼″, 1½″, and 2″ | 58.50 per 1,000 |
| Splits 1″ | 60.25 per 1,000 |
| Neck #3 | 64.00 per 1,000 |
| End skews | 64.00 per 1,000 |
| Tongue and groove | 60.00 per 1,000 |
| X-blocks | 80.00 per 1,000 |

A deduction of 10 per centum for "commission" was made on some of the invoices while in others the deduction was either 7½ per centum or 5 per centum for commission. Other sales were made to customers in Vancouver at the same prices, net. The prices are all f. o. b. Kilgard or Abbotsford.

Other invoices cover the same articles priced at $5 per 1,000 higher, net, f. o. b. Kilgard. Those appear to cover the sales to customers which witness Roaf designated as strangers. There are also some invoices which contain lower prices such as the ones to Consolidated Mining & Smelting Co. of Trail, B. C., at $48 per 1,000.

The plaintiff contends that inasmuch as Clayburn Co., Ltd., controls or restricts the f. o. b. Kilgard or Abbotsford resale prices of its agents, under the well-settled construction of section 402 (c), Tariff Act of 1930, a foreign value in the Kilgard market does not exist, citing Goodyear Tire & Rubber Co. v. United States, 11 Ct. Cust. Appls. 351, T. D. 39158; Meadows, Wye & Co. (Inc.) v. United States, 17 C. C. P. A. (Customs) 36, T. D. 43324; United States v. Philipp Wirth et al., 20 C. C. P. A. (Customs) 94, T. D. 45705; United States v. Half Moon Mfg. & Trading Co., Inc., 28 C. C. P. A. (Customs) 1, C. A. D. 115; United States v. Paul J. Pauls, 28 C. C. P. A. (Customs) 7, C. A. D. 116; United States v. Graham & Zenger, Inc., 31 C. C. P. A. (Customs) 131, C. A. D. 262. The plaintiff contends also that the prices at which the dealers in Vancouver sell the merchandise to consumers or other dealers are the freely offered prices to all purchasers and that the merchandise should be reappraised at those values.

An examination of paragraph 7 of the contract between Clayburn Co., Ltd., and Evans and Associates (exhibit 10–A), above-quoted

shows clearly that there was an agreement to control the prices at which those firms may resell the merchandise. Under the terms of the contract a further agreement is contemplated but the statement beginning at the bottom of page 1 of exhibit 13, above-quoted, and the testimony of the parties to the contract, explains the further agreement. It appears from this evidence that the subsequent agreement controls the prices at which the merchandise may be resold f. o. b. Kilgard or f. o. b. Abbotsford, but the prices at which they may be resold in the Vancouver market are not controlled. Exhibit 19, which is a copy of an invoice of Evans, Coleman & Evans, Ltd., is an example of a sale f. o. b. Abbotsford under the agreement.

The record shows that Clayburn Co., Ltd., freely offered the firebrick to dealers in Vancouver and also to dealers and consumers in other territories, but, according to the agreement with Evans and Associates, it controlled the prices at which those firms could resell the merchandise f. o. b. Kilgard or f. o. b. Abbotsford. Such control of prices is sufficient to establish the plaintiff's claim that the sales f. o. b. Kilgard and Abbotsford did not establish foreign value in that market, because the resale prices by the dealers were controlled.

The decisions in *Bill & Caldwell, Inc.* v. *United States*, Reap. Dec. 5996, and *United States* v. *H. W. Robinson & Co., State Forwarding Co.*, and *Edgar S. Bibas*, 19 C. C. P. A. (Customs) 274, T. D. 45436, are particularly applicable to the point herein involved. In the *Bill & Caldwell, Inc.*, case, *supra*, the merchandise consisted of men's fur felt hats which were freely sold by the manufacturer to wholesalers and to retailers. The manufacturer controlled the prices at which the retailers could resell the hats, but there was no control over the prices at which the wholesalers could sell. The court held that, in view of the control of the prices at which the retailers could sell the hats, there was no foreign value for the goods, citing *United States* v. *Heemsoth-Kerner Corp. (Bauer Type Foundry, Inc.)*, 31 C. C. P. A. (Customs) 75, C. A. D. 252.

In the case of *H. W. Robinson & Co. et al.* v. *United States*, *supra*, the merchandise consisted of tie silk squares. The manufacturer limited his sales to wholesalers and it was held that sales by the manufacturer were restricted and therefore did not establish a foreign value. However, the wholesalers offered the merchandise freely to all persons who wished to buy, but tie manufacturers were the only purchasers. The court held that the prices which the wholesalers received from the tie manufacturers were the foreign values of the goods.

The situation in those cases is analogous to that herein involved. Here the prices at which the agents sold were controlled when they resold the merchandise f. o. b. Kilgard or Abbotsford. Therefore

I hold that there was no foreign value at Kilgard. The managing director of Clayburn Co., Ltd., testified that he sold 70 per centum of the firebrick, or refractory products, manufactured by his company to his agents in Vancouver who in turn freely resold them to all purchasers in the ordinary course of trade. Therefore, Vancouver is an open market where the majority of the products of the manufacturer was disposed of and is one of the principal markets for such merchandise in Canada. In harmony with the ruling in *United States* v. *H. W. Robinson et al.*, *supra*, I find that the prices at which the dealers in Vancouver sold the goods are the foreign values of the merchandise.

Counsel for the defendants urges that the title to the goods passed to the agents or Vancouver dealers when the articles were loaded on their trucks at Kilgard, citing many cases. In my opinion that does not change the situation, so long as the prices at which the agents sold at Kilgard were controlled by the manufacturer.

Counsel for the defendants urges also that an examination of the exhibits shows that no uniform prices for the various articles exist in Vancouver, and, therefore, that the plaintiff failed to meet its burden of establishing the price at which the merchandise was freely offered for sale to all purchasers in that market in accordance with the provisions of section 402 (c) of the Tariff Act of 1930. There is authority for holding that where goods are sold at different prices in wholesale quantities, the highest price is the price at which the goods shall be considered as freely offered for sale to all purchasers. *United States* v. *Mexican Products Co.*, 28 C. C. P. A. (Customs) 80, C. A. D. 129.

It appears from the evidence that the dealers in Vancouver sold a great deal of the merchandise at a price which included delivery to the purchaser. It is manifest that when a truckload of the merchandise was delivered from Kilgard there was but one handling, but, if the customer of the dealer bought merchandise delivered from warehouse in Vancouver, the cost of the goods would include delivery from Kilgard, handling when the goods were unloaded and placed in warehouse, handling again when they were loaded on the truck for delivery to the purchaser, and the cost of delivery to the purchaser. Naturally the sales prices would vary, depending on the character of the purchase contract. I am of opinion that the cost of delivery from the warehouse to the customer is not a part of the foreign value of the firebrick. The prices at which they were sold at the warehouse without delivery should be the criterion.

Plaintiff contends that the following net prices represent the foreign values of the articles in issue:

| | Canadian currency |
|---|---|
| Firebrick squares (9 x 4½ x 2½ inches) | $66.00 per 1,000 |
| Firebrick soaps | 66.00 per 1,000 |
| Firebrick end wedges (#1 and #2) | 66.00 per 1,000 |
| Firebrick splits (1, 1¼, 1½, and 2 inches) | 66.00 per 1,000 |
| Firebrick side arches (#1 and #2) | 66.00 per 1,000 |
| Firebrick necks (#3) | 66.00 per 1,000 |
| Firebrick end skews | 72.50 per 1,000 |
| Firebrick tongue and groove | 71.00 per 1,000 |
| Firebrick (9 x 6 x 2½ inches) | 115.00 per 1,000 |

The above prices are not the highest for the particular articles in the various exhibits, but, in view of the reservation which counsel for the Government made to the stipulation with regard to the usual wholesale quantities in which the goods were bought and sold (above-quoted) it is believed that he admits that the higher prices do not apply to transactions in the usual wholesale quantities. I find from an inspection of the invoices of Evans, Coleman & Evans, Ltd. (collective exhibits 18-A, 18-B, 18-C, 18-D, and 18-E and collective exhibit 2) that there were many sales at the values claimed in which the charge for delivery to the customer from the vendor's wharf or warehouse was not included in the unit value. I sustain the plaintiff's claim and reappraise the firebrick described in the above schedule at the prices indicated therein, thereby holding that the prices above noted are the prices at which the merchandise was freely offered for sale in the usual wholesale quantities in the ordinary course of trade in Vancouver.

On the invoices covered by reappraisements 138690-A and 139317-A, there are some items invoiced as "firebrick wedge, #1 and #2, 20 inch vacuum" and "firebrick arch #2 and #3, 20 inch vacuum." Those items were entered and appraised at $56 (United States currency) per 1,000, net. No evidence was introduced in regard to the value of that merchandise and I reappraise the said goods at the value found by the appraiser, which is presumptively correct.

Judgment will be rendered accordingly.