M. V. JENKINS ET AL. *v.* UNITED STATES

No. 6131.—Invoices dated Vancouver, B. C., Canada, December 29, 1939, etc.
Entered at Sumas, Wash., January 2, 1940, etc.
Blaine, Wash., October 14, 1940, etc.
Entry Nos. 683–K, 680–E, etc.

First Division, Appellate Term

(Decided April 20, 1945)

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the appellants.

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the appellee.

Before OLIVER, COLE, and EKWALL, Judges

COLE, Judge: Clayburn Co., Ltd., of Vancouver, British Columbia, manufacturers of firebrick and other refractory products, exported several items of their merchandise between December 29, 1939, and April 21, 1941, and the shipments were entered at Sumas and Blaine, Wash. Appraisement was made on the basis of foreign value, section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. 1940 ed. § 1402 (c)),[1] the importer's entered values, representative of the manufacturer's prices to dealers, being accepted as such dutiable value. The collector of customs appealed for reappraisement, and in *United States* v. *Jenkins et al.* (13 Cust. Ct. 345, Reap. Dec. 6040), Cline, J., found, for the items hereinafter specified, foreign values higher than those adopted by the appraiser.

This case is before us upon application for review, section 501 of the Tariff Act of 1930, filed by the importers (defendants below) so far as the said decision relates to those items.

---

[1] § 1402. VALUE.

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The record herein is voluminous, consisting of considerable testimony, and documentary evidence in the form of letters, schedules, or lists of prices, and several hundred invoices. The trial judge analyzed the line of proof offered by both sides in a way entirely acceptable to us, so it is unnecessary to detail the evidence herein. Counsel for appellant, in their brief, express satisfaction with all of the lower court's factual statements (TREASURY DECISIONS, adv. sheets issued July 27, 1944, pp. 16–27), except the one finding that counsel had stipulated "that the merchandise should be reappraised on the basis of foreign value." The inference has been drawn from a discussion between counsel in which both admitted that foreign value was sought to be established as the proper basis for appraisement. We do not regard the remarks of counsel as an attempt to stipulate the basis for appraisement. It may be viewed as a concession, but it does not preclude appellants from contending, as they do in assignment of error (13), that foreign value does not exist for the merchandise in question.

Included among appellants' 13 assignments of error is one (No. 5) alleging that the lower court erred "in denying appellant's motion (R. 152–3) to dismiss these appeals because of plaintiff's (below) failure to establish an amount of 'foreign value' different from the appraised values." In this connection it should be observed that the present case arose subsequent to enactment of the Customs Administrative Act of 1938 (52 Stat. 1084), which requires the court to determine the value of the merchandise "notwithstanding that the original appraisement may for any reason be held invalid or void." Hence, the court must find a value under any circumstances arising in this reappraisement proceeding, and under no condition does dismissal become proper disposition. *Carey & Skinner, Inc.* v. *United States* (12 Cust. Ct. 352, Reap. Dec. 5975). Notwithstanding this technical reason for the denial of a motion to dismiss herein, the analysis of the testimony and related issues as hereinafter developed discloses that the court is in disagreement with the reasons assigned for dismissal of these appeals.

In disposing of the remaining assigned errors, filed pursuant to Rule XXXVIII of this court, as amended in T. D. 49308, we find it unnecessary to discuss each separately. All of them dovetail so completely as to the reasons therefor that a general discussion of the evidence and the law applicable thereto, as we view them, discloses our reasons for the disposition of each while discussing them in their entirety. This procedure becomes preferable in the light of parallel situations, so far as the transactions involving the instant merchandise are concerned, prevailing in the present case and in *Jenkins* v. *United States* (Reap. Dec. 6090), decided by the writer on January 31, 1945 (hereinafter referred to for convenience as the previous case). in which

the same parties litigant participated. Appellants' attitude, concerning the likeness of the two cases, is reflected in the following colloquy which took place at the time of the oral argument of this case:

Judge COLE. Mr. Tuttle, before you proceed, might I ask if the factual situation you have outlined agrees with the other case of *Jenkins* vs. *United States* [the previous case], which is before me at the present time?

Mr. TUTTLE. It does, Your Honor, except that in this record there are considerably more exhibits showing actual transactions, and I think that's the only material difference between the two records. I mean by those, there are hundreds of invoices or records of sales that completely cover or are intended to completely cover all sales either by Evans or by Clayburn or by these several other dealers, sir.

Presiding Judge OLIVER. Are these additional facts that Judge Cole just referred to cumulative or do they change the situation of the whole thing?

Mr. TUTTLE. Only in this way. In the case Your Honor referred to, Mr. Roaf testified that he sold at certain prices under certain conditions and granted discounts to certain people. You have that unimpeached testimony before you. Here he testified to exactly the same thing, but in addition we have the transactions themselves, and that really is the only essential difference between the two records, Your Honor.

Judge COLE. The reason I ask is the case was tried before me on the Pacific coast. I held the case back for decision to wait this argument today.

Mr. TUTTLE. Yes, sir.

Judge COLE. As you know, it is in my office at this time. I found a striking similarity, of course, between the two.

Mr. TUTTLE. Yes, you would, Your Honor.

Judge COLE. Very well.

That the previous case arose as an importer's appeal for reappraisement and the present one was instituted by the collector of customs, does not affect the controlling influence of the former, as hereinafter set forth.

The following factual situation flows from the testimony in both cases. Clayburn Co., Ltd., has its offices at Vancouver, British Columbia, with a factory, where the firebrick products are manufactured, at Kilgard, B. C., approximately 50 miles from Vancouver. Kilgard is without a railroad connection so all merchandise shipped therefrom is sent by truck. Shipments by railroad are first taken by truck to a "rail head," Abbotsford, B. C., about 5 miles distant where the merchandise is loaded on cars and shipped to its destination. The products of said Clayburn Co., Ltd., are superior in quality to firebrick and refractory products manufactured by other firms in Canada, and the company's transactions are confined, so far as their legal aspect is concerned, to dealers. All of the manufacturer's sales to dealers are f. o. b. Kilgard or f. o. b. Abbotsford, with a restriction on the resale of the merchandise by any Canadian dealer requiring the latter to adhere to the manufacturer's base prices when selling merchandise in wholesale quantities f. o. b. Kilgard or f. o. b. Abbotsford.

The foregoing factual structure supports but one conclusion when the quoted statutory law is applied. This law is peculiarly for tariff

purposes, and it is difficult, if not impossible, to find recognized authorities—text and case law—other than the able expressions of this court and the Court of Customs and Patent Appeals, discussing questions similar to those with which we are here concerned. Particularly applicable now is the statutory term "principal market," which is of primary importance at this point; whether it is Kilgard, as claimed by appellants, or Vancouver, British Columbia, as found by the lower court in sustaining the Government's contention.

Appellants contend that Kilgard is a principal market for the reason that a "market" is the place of sale rather than the place of delivery, *Goldmark* v. *United States*, 22 C. C. P. A. 358, T. D. 47376, and *United States* v. *Hallet & Carey Co.*, Reap. Dec. 3668. Appellants also cite in support of their contention *Kokumo Steel & Wire Co.* v. *Republic*, 268 Fed. 917; *Neer* v. *Lang*, 252 Fed. 575; *United States* v. *Chevallier*, 107 Fed. 434; *Hoffman* v. *Gosline*, 172 Fed. 113; *United States* v. *Cline*, 26 Fed. 515; *United States* v. *Andrews*, 207 U. S. 229; and *De Bary* v. *Dunne*, 172 Fed. 940. All of these cases concerned the relationship of parties under contracts for the sale of merchandise. Viewing the situation discussed in each, in the light of the intention of the contracting parties, they are sound and logical, but have no application here because of the peculiar language of the statute, section 402 (c), as amended, *supra*, that controls the present issue.

Determination of a principal market for tariff purposes is not dependent on actual sales. Nor are executory agreements necessary to satisfy the law. The statutory definition of foreign value hereinabove quoted, is clear that only *offers for sale* need be shown as a basis for appraisement. *Oceanic Trading Co.* v. *United States*, 21 C. C. P. A. (Customs) 146, T. D. 46478. The rule was followed in *United States* v. *T. E. Ash*, 22 C. C. P. A. 395, T. D. 47401, wherein the court observed that "the section [section 402 (c)], says nothing of *actual sales*," and further stated "If the statute required foreign value to be determined on the basis of actual foreign sales, the question might be a more difficult one, * * *, but the statute does not so require and no necessity exists for any adjudication here of the effect of the actual foreign sales upon the question of foreign value."

The record before us is conclusive that the manufacturer's sales to its dealers are exclusively on an f. o. b. basis, either Kilgard, the place of manufacture of these firebrick products, or Abbotsford, a "rail head" 5 miles distant, and while the legal presumption under "f. o. b." contracts is that the property passes to the buyer at the time of delivery free on board, unless an intention to the contrary—express or implied, but clear—exists, that principle is not applicable here in the light of the judicial pronouncements in the *Oceanic* and *Ash* cases, *supra*.

*United States* v. *Hallet & Carey Co.*, 68 Treas. Dec. 1286, Reap.

Dec. 3668, involving the dutiable value of refuse screenings imported at Toledo, Ohio, from Fort William, Ontario, Canada, presented a situation somewhat analogous to the present one, and in finding the principal market, the court said:

> While the evidence shows that all sales for exportation to the United States are at prices f. o. b. Fort William or Port Arthur, Ontario, the plaintiff's own evidence, both oral and documentary, shows conclusively that the actual buying and selling, in most cases at least, take place in Winnipeg, Manitoba, "because of the facilities afforded by the Winnipeg Grain Exchange as a meeting place for the transaction of business."
>
> Under this state of facts we must hold that Winnipeg is the principal market in Canada for the sale of this particular class of merchandise for export to the United States. * * *.

In the present case, all facilities for the manufacturer's transactions in the merchandise in question are at Vancouver. Orders are directed to Vancouver and invoices are prepared at the same place. The following testimony of the managing director of Clayburn Co., Ltd., also lends support to this view:

> X Q. And, do you formulate the policy to be followed by your company with reference to sales?—A. I do.
>
> X Q. And it is through you that the dealers and jobbers arrange with your company to purchase merchandise from your company?—A. It is through the Vancouver office. If I am not there they would not turn down a sale because I personally am not there.
>
> X Q. I mean in arriving at an agreement?—A. In arriving at agreements, certainly.

It is reasonable to conclude that all offers and acceptances are effected at Vancouver. Kilgard is merely the location of the manufacturing plant where a stock of thousands of the different items of firebrick is maintained. But there is nothing in the record to indicate in any way that actual buying and selling occur there. It is true that the quantity covered by any particular sale is not removed from stock until it is loaded on a carrier, and it may well be that title to the buyer does not pass until that time, but these elements of a transaction are relatively unimportant to the present issue. Following the reasoning applied in the *Oceanic*, *Ash*, and *Hallet & Carey* cases, *supra*, Vancouver, British Columbia, is held to be the principal market for the products under consideration.

While this conclusion agrees with the finding of the lower court on the same phase of the instant case, the reasoning followed here, in excluding Kilgard and accepting Vancouver, differs somewhat from that employed by the trial judge who rejected Kilgard solely because of the controlled price.

Consideration will now be directed to the prices charged by Clayburn Co., Ltd., and the legal effect of the price control exercised by that company over the resale of its merchandise by dealers. Appellants admit the existence of the restriction requiring dealers, when

selling merchandise f. o. b. Kilgard or f. o. b. Abbotsford, to adhere to the manufacturer's base prices, but contend that this price control is immaterial to the present controversy, arguing as follows:

> On behalf of plaintiff it is admitted that the above restriction existed, but it is contended that this is immaterial because Clayburn also offered and sold its products to the same dealers without restriction as to use, resale, etc. Therefore the merchandise was, in the language of section 402 (c) "freely offered  *  *  * to all purchasers."

*United States* v. *Richard,* 15 Ct. Cust. Appls. 143, T. D. 42216; *United States* v. *Glanzstoff Corp.,* 24 C. C. P. A. 35, T. D. 48308; *American Shipping Co.* v. *United States,* 29 C. C. P. A. 250, C. A. D. 198; and *United States* v. *Mexican Products Co.,* 28 C. C. P. A. 80, C. A. D. 129, are cited to support that proposition. The principle followed in each of those cases, however, is not applicable here. In all of them, it appeared of record that preferential treatment, in the matter of price, was accorded certain classes of purchasers who received benefits or privileges not allowed to all purchasers, and in finding dutiable value the court held it to be the price at which all who cared to buy may purchase.

A comparable situation does not exist in the present case. Here, we find a market in which a price control is exercised. Clayburn Co., Ltd., imposes a restriction in prices at which its merchandise may be resold by building supply dealers, the only class of purchasers to whom the said manufacturer sells. Such a control eliminates from consideration as statutory foreign value the manufacturer's base price, *J. H. Cottman & Co.* v. *United States,* 20 C. C. P. A. 344, T. D. 46114, holding that restrictions imposed upon the resale and disposition of merchandise sold in the foreign market prevented prices at which the phosphate rock there under consideration was sold from being considered in finding dutiable foreign value. The same conclusion was reached in *United States* v. *Half Moon Mfg. & Trading Co.,* 28 C. C. P. A. 1, C. A. D. 15, under market conditions whereby manufacturers of bottle caps sold to dealers through an agreement which included a provision that the latter would not resell the merchandise below prices specified in the manufacturer's offer. *United States* v. *Graham & Zenger, Inc.,* 31 C. C. P. A. 131, C. A. D. 262, followed the same principle in holding the Belgian market to be controlled where glassware manufacturers restricted the resale of their merchandise to purchasers for home consumption.

In all of the three cases just cited, the control in the foreign market was found to be complete. In other words, the restriction was imposed by all sellers in wholesale quantities and extended throughout the principal markets. *United States* v. *Heemsoth-Kerner Corp. (Bauer Type Foundry, Inc.),* 31 C. C. P. A. 75, C. A. D. 252, found the United States market to be controlled where the manufacturer's list

prices in the principal market did not apply to purchasers in territories allotted to distributors. Here, again, the control extended throughout the market.

There is a vital distinction between the above-mentioned cases, wherein the question of a controlled market was involved, and the present case. Here, the restriction is imposed by the manufacturer only and extends to but one class of purchasers, thereby limiting the scope of the control which does not go beyond the building supply dealers, the sole class of purchasers from the manufacturer. While the restriction is confined to transactions between the manufacturer and its customers, it is all forceful and controlling within its sphere, completely nullifying, as it does, the manufacturer's base prices as representative of dutiable foreign values.

Because of its limited influence, the price control referred to does not affect sales made according to statutory requirements. And in the present record there is evidence showing existence of such a market. A combination of firms in British Columbia, known as Evans, Coleman & Evans, Ltd., and Associated Companies, building supply dealers doing business throughout the Province of British Columbia, freely offered the products in question in wholesale quantities in the principal market of Vancouver. Some sales were made at a value that did not include in the unit price the cost of delivery to the customer from the dealers' warehouses; others were made at a price which included cost of delivery to the purchaser. In adopting dealers' warehouse prices as the criterion for determining dutiable foreign value the lower court said that "It is manifest that when a truckload of the merchandise was delivered from Kilgard there was but one handling, but, if the customer of the dealer bought merchandise delivered from warehouse in Vancouver, the cost of the goods would include delivery from Kilgard, handling when the goods were unloaded and placed in warehouse, handling again when they were loaded on the truck for delivery to the purchaser, and the cost of delivery to the purchaser. Naturally the sales prices would vary, depending on the character of the purchase contract. I am of opinion that the cost of delivery from the warehouse to the customer is not a part of the foreign value of the firebrick." There is substantial evidence amply supporting this reasoning which we follow in reaching the same conclusion.

There is no merit in appellants' contention that the said dealers' prices do not conform to statutory requirements because they represent prices of Vancouver dealers selling only in British Columbia under terms of a written agreement (exhibits 10–A and 10–B), and therefore are controlled or restricted in scope. *United States* v. *Heemsoth-Kerner Corp.*, 31 C. C. P. A. 75, C. A. D. 252, cited by appellants to support this theory, did not involve comparable cir-

cumstances. There, the importing corporation and exclusive United States agent for the foreign manufacturer bound itself, through written agreements, not to permit sales in a district allotted to a distributor appointed to sell in a specified territory. The importer reserved the principal market and other unassigned localities for itself. The court found that while the merchandise was freely offered by the importer in the principal market to all purchasers in some portions of the United States, it was not freely offered to purchasers in territories allotted to distributors, which territories covered a major portion of the United States, and therefore held that the merchandise was not freely offered to all purchasers in the ordinary course of trade within the tariff meaning of foreign value.

In the present case, there is no control exercised in the ordinary course of trade. Evans, Coleman & Evans, Ltd., and Associated Companies, who freely offer the merchandise to all purchasers in the principal market, sell the vast majority of the manufacturer's products in question in the Province of British Columbia where a very high percentage—the lower court found 70 per centum—of the Clayburn Co.'s refractory products are sold. The manufacturer also sells in the Province of Alberta. There are one dealer in Calgary and three in Edmonton who purchased at prices lower than the base prices paid by the dealers in British Columbia, yet no explanation was offered for the difference in the manufacturer's selling prices. However, it appears of record that sales to the Alberta trade of all of the Clayburn Co.'s products, pipe, clay, and sand, as well as all refractory products, amounted to only 5 per centum of the manufacturer's entire 1940 output. Clearly, the volume of business in Alberta involving the items in question was relatively infinitesimal.

Our conclusion herein presents no conflict with the decision of this court in *Bill & Caldwell, Inc.* v. *United States*, Reap. Dec. 5996. In that case, the court held the foreign market to be controlled from a set of facts showing that the manufacturer of men's fur-felt hats, known as Borsalino hats, sold the merchandise in the principal market of Alessandria, Italy, to wholesalers and retailers, the latter being subject to a restriction on resale prices, that was not applied to the former.

The distinction between that case and this lies in the extent to which the control applied. There, the exporter or shipper, who was also the manufacturer, sold the hats to both classes of purchasers. Although the price control applied to only one class, i. e., retailers, the manufacturer, who exercised such control, was the sole distributor or seller of the merchandise in wholesale quantities. Here, there are two distinct classes of sales in wholesale quantities of the products in question, those by the manufacturer to dealers at a controlled price, and sales by dealers to their customers at freely offered prices.

*United States* v. *Robinson & Co.*, 19 C. C. P. A. 274, T. D. 45436, presented a condition analogous to that herein. There, the merchandise consisted of silk tie-squares used in the making of neckties. The manufacturers of such and similar tie squares restricted their sales to wholesalers only. The wholesalers resold the merchandise to all who wished to purchase. Both manufacturers and wholesalers sold in wholesale quantities. Because of the restriction exercised by the manufacturers, the court held their prices were not representative of dutiable value, and accepted the wholesalers' prices, being freely offered to all who cared to buy, as the foreign value of the merchandise. The reasoning in that case fully supports the finding here that a free and open market existed between the dealers and their customers who bought in wholesale quantities.

We find as matter of fact:

(1) That the merchandise in question consists of firebrick or refractory products, described by the items enumerated below.

(2) That the proper basis for appraisement of said items is foreign value, section 402 (c), as amended, *supra.*

(3) That the said items, being superior in quality, are not similar to any other firebrick or refractory products manufactured in the country of exportation.

(4) That the principal market for such merchandise is Vancouver, British Columbia.

(5) That the manufacturer's prices to its dealers are controlled prices and therefore not acceptable as dutiable foreign values.

(6) That the dealers freely offered the products in question for home consumption to all purchasers in wholesale quantities in the said principal market, and therefore their prices are the dutiable foreign values.

Accordingly, we hold as matter of law that the statutory foreign values, section 402 (c) as amended, *supra*, for the items in dispute are as follows:

*Canadian currency*

| | |
|---|---|
| Firebrick squares (9 x 4½ x 2¼ inches) | $66.00 per 1,000 |
| Firebrick soaps | $66.00 per 1,000 |
| Firebrick end wedges (#1 and #2) | $66.00 per 1,000 |
| Firebrick splits (1, 1¼, 1½, and 2 inches) | $66.00 per 1,000 |
| Firebrick side arches (#1 and #2) | $66.00 per 1,000 |
| Firebrick necks (#3) | $66.00 per 1,000 |
| Firebrick end skews | $72.50 per 1,000 |
| Firebrick tongue and groove | $71.00 per 1,000 |
| Firebrick (9 x 6 x 2½ inches) | $115.00 per 1,000 |

The judgment of the lower court is affirmed.

Judgment will be rendered accordingly.