UNITED STATES *v.* M. V. JENKINS ET AL.

No. 7615.—Invoices dated Vancouver, B. C., Canada, December 29, 1939, etc. Entered at Sumas, Wash., January 2, 1940, and at Blaine, Wash., October 14, 1940, etc. Entry Nos. 683–K, etc.; 680–E, etc.

(Order dated August 18, 1948)

*Paul P. Rao*, Assistant Attorney General (*Joseph A. Howard, Jr., William J. Vitale*, and *Daniel I. Auster*, special attorneys), for the plaintiff.

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the defendants.

### ORDER

CLINE, Judge: When these cases were originally before me, I held that the proper basis for reappraisement of the merchandise was foreign value; that the principal market for such merchandise was Vancouver, B. C.; that the manufacturer's prices to dealers were controlled, but that the dealers freely resold the merchandise to all purchasers in the ordinary course of trade; that their prices established foreign value and that the prices claimed by the plaintiff represented foreign value. *United States* v. *M. V. Jenkins et al.*, 13 Cust. Ct. 345, Reap. Dec. 6040. This decision was affirmed by the appellate division. *M. V. Jenkins et al.* v. *United States*, 14 Cust. Ct. 393, Reap. Dec. 6131. On appeal to the Court of Customs and Patent Appeals, it was held that the lower courts correctly found that the principal market for the merchandise was at Vancouver; that no control was exercised there in the sale of the merchandise; that the dealers freely offered it for sale in that market to all purchasers in the usual wholesale quantities in the ordinary course of trade. *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. 33, C. A. D. 341. However, the Court of Customs and Patent Appeals stated that since neither the trial court nor the appellate division actually found the usual wholesale quantities in which each of the articles was freely offered for sale to all purchasers in the principal markets of Canada for home consumption, it could not determine whether there was any substantial evidence of record to support the judgment of the appellate division. Accordingly, it reversed that decision and remanded the case to the appellate division with instructions to remand it to the trial court to find the usual wholesale quantities and the prices at which the articles were freely offered for sale in usual wholesale quantities for home consumption.

Plaintiff claims that the values originally found by this court are the prices at which the articles were freely offered for sale in the usual wholesale quantities for home consumption. The defendants contend that identical articles were freely offered for sale in the usual wholesale quantities by several sellers at different prices, so that no foreign value existed.

The Court of Customs and Patent Appeals stated that there was no dispute as to the correctness of foreign value as the basis of appraisement, but that "the controversy here is limited to the proper amount of the statutory value of the merchandise and *whether any foreign value for it was shown to exist.*" [Italics supplied.]

If it should be found that there was no uniform price at which the merchandise was sold, it would be necessary to hold that no foreign value existed. *United States* v. *M. Minkus*, 21 C. C. P. A. 382, T. D. 46912, and cases there cited.

As to the usual wholesale quantities, the importers state in their brief that the following are the usual wholesale quantities in which the various items are sold:

| | | |
|---|---:|---|
| Squares | 1,000 | pieces |
| Soaps | 200 | " |
| End wedges | 1,000 | " |
| Splits | 200 | " |
| Side arches | 200 | " |
| Small X-blocks | 200 | " |

The Government in its reply brief has agreed with the above figures except as to the small X-blocks, as to which it contends that there is no necessity for determining the usual wholesale quantities. Defendants claim that there were insufficient sales to determine the usual wholesale quantities of necks, and skews, and tongue-and-grooves. The Government claims that the usual wholesale quantities for end skews is from 100 to 500 pieces, and for tongue-and-grooves, 300 pieces, and that there is no necessity for determining the usual wholesale quantities of necks.

Basing the finding of usual wholesale quantities on the major portion of sales in wholesale quantities of the merchandise in question (*United States* v. *M. Minkus, supra*), the record supports the conclusions reached by counsel for the respective parties as to the usual wholesale quantities of squares, soaps, end wedges, splits, and side arches. As to the small X-blocks, it appears that the greatest number of sales were in quantities of 200. There was but one sale of necks in a quantity of 100; six sales of end skews, two of which were in quantities of 300; and five sales of tongue-and-grooves, two in quantities of 300 and two in quantities of 500. I find that these sales are insufficient to establish the usual wholesale quantities in which necks, end skews, and tongue-and-grooves were sold.

It is now necessary to analyze the sales in the usual wholesale quantities in order to determine whether uniform prices have been established for the various articles.

The briefs are in agreement that sales were made to three classes of purchasers: (1) Dealers, (2) industrials and large contractors, (3) small contractors; and that prices to dealers were based upon accommodations to favored customers and prices to smaller contractors were at retail. Consequently, the only sales to be considered are those to industrials and large contractors. Such sales were made by Evans, Coleman & Evans, Ltd.; McCleery & Weston, Ltd.; Champion & White, Ltd.; and Gilley Bros., Ltd.

Horace E. Wager, customs agent, United States Treasury Department, testified that the dealers did not publish price lists but each had a manual containing a list of prices and such prices would be quoted to anyone who asked for them. Mr. Wager stated that those manuals were exhibited to him; that letters were dictated from them and that the dealers stated that those were the prices at which the goods were freely offered to the trade. The letters or memoranda mentioned were admitted into evidence as part of plaintiff's collective exhibits 2, 3, 4, and 6. They contain the following prices:

| Articles | Evans, Coleman & Evans, Ltd. (Can. $) | | McCleery & Weston, Ltd. (Can. $) | | Gilley Bros., Ltd. (Can. $) | |
|---|---|---|---|---|---|---|
| Squares | 66 | per M | 65 | per M | 64 | per M |
| Soaps | .66 | " " | 65 | " " | 64 | " " |
| End Wedges | 66 | " " | 65 | " " | 64 | " " |
| Splits | 66 | " " | 65, 69 | " " | 64 | " " |
| Side Arches | 66 | " " | 65 | " " | 64 | " " |
| End Skews | 72.50 | " " | | | 75 | " " |
| Tongue-and-grooves | 71 | " " | | | 66.50 | " " |
| Necks | 66 | " " | | | 64 | " " |
| Small X-blocks | 115 | " " | 120 | " " | 100 | " " |

The letter from Champion & White, Ltd. (plaintiff's collective exhibit 4), states:

Our price to large industrial consumers since April 1st, 1941 has been highly competitive and more or less variable, that is, over and above our consistent price of $65.00 per M, delivered to the purchasers place of business or operation, which will be noted from our sales for such.

There appear to be three possible methods by which the brick sold by the dealers could reach the consumer: (1) It could be delivered by truck directly from the Clayburn Factories to the consumer in Vancouver, (2) it could be picked up by the consumer at the warehouses of the respective dealers, (3) it could be delivered by the dealers to the consumer from stock in their warehouses. It is logical that the prices in each case might be different. On the list of prices given by Evans, Coleman & Evans, Ltd., it is stated:

The above prices are the delivered prices to consumers in Vancouver, B. C. and include a cartage cost of $2.00 per ton or $7.00 per M for trucking from the Clayburn Factories at Kilgard, B. C. to consumers Vancouver destination: $2.00 per M. is added for stocking, warehousing and handling, and cartage for unusual distance delivery or small lots delivered in the Vancouver area from our local stock.

The list of prices of McCleery & Weston, Ltd., does not indicate whether there was any difference due to method of delivery. Mr. Wager testified that the prices were those at which McCleery & Weston, Ltd., delivered the merchandise at its plant in Vancouver and not redelivery prices from stock to the purchaser's destination.

That does not indicate, however, whether McCleery & Weston, Ltd., ever delivered the merchandise directly from the factory to the consumer or what the price would then be.

As indicated in the above-quoted statement, the prices of Champion & White, Ltd., were those at which the merchandise was delivered to the customer, although whether directly from the factory or from the warehouse is not stated.

The memorandum of Gilley Bros., Ltd., contains the following:

The above prices are quoted in load lots for delivery to purchasers destinations in the New Westminster vicinity direct from factory. Extra charges are added for all deliveries from our New Westminster stock.

It is logical to assume that the prices where the merchandise was delivered from the factory to the customer in Vancouver or New Westminster would be the same as the prices at the warehouse, since no additional handling or trucking operations would be involved. This assumption is borne out by the testimony of Mr. Wager that Gilley Bros., Ltd., sold at a dollar less because its warehouse was 11 miles nearer the factory and by the fact that its sales prices were for the New Westminster area.

Foreign value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, as follows:

The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

An extra charge for cartage or delivery is therefore not properly included in the dutiable value.

As the lists of prices given by the dealers do not indicate uniform prices, it is necessary to examine the actual sales to determine whether a single price may be found for each of the imported articles. The sales referred to herein are those which were taken from the dealer's invoices by Mr. Wager (plaintiff's collective exhibits 2, 3, 4, 6). The headings of these extracts indicate that the prices of Evans, Coleman & Evans, Ltd., on sales to large contractors were f. o. b. Vancouver; that the prices of McCleery & Weston, Ltd., were f. o. b. consumer's destination; that the prices of Champion & White, Ltd., were f. o. b. Vancouver; and that the prices of Gilley Bros., Ltd., were f. o. b. consumer's destination. Nothing is indicated as to the sales of Evans, Coleman & Evans, Ltd., to large industrials. In certain instances notations were made by Mr. Wager in regard to the sales to show how the price in the list of prices was applied; "either it was a quantity price, a small order price, or some other reasonable explanation

by which that particular jobber deviated from the lists of prices, shown on these lists." It must be assumed, therefore, that the prices are comparable, that is, for the same type of delivery, unless a contrary notation has been made.

I consider first the sales of squares. The parties are in agreement that the usual wholesale quantity was 1,000 pieces. The record shows 25 sales in this quantity, 13 at $66, 6 at $65, 3 at $64, and 3 at $63. (All prices mentioned herein are in Canadian dollars for 1,000 pieces.) The sales by Evans, Coleman & Evans, Ltd., are as follows: nine at $66, two at $64, and two at $63. It appears from Mr. Wager's notation that the sales at $64 were the prices for large industrials and that the sales at $63 were large quantity purchase prices, and that in one sale at $66, $3 for cartage was added on account of delivery from stock to purchaser.

The sales by McCleery & Weston, Ltd., were as follows: Two at $66, five at $65, and one at $63.

Gilley Bros., Ltd., made one sale at $64, one at $65, and two at $66. Mr. Wager's comments indicate that $2 was added for cartage on the sales at $66 and that the sale at $64 was "Ex Gilley Bros. stock in New Westminster, B. C."

Eliminating the sales covered by special circumstances, there remain 10 sales in Vancouver at $66, 5 at $65, and 1 at $63, and 1 sale in New Westminster at $64. It cannot be said that there is a single price at which this merchandise was sold, although the majority of the sales were at $66.

An examination of all the sales in wholesale quantities indicates that the variation in prices does not depend upon the quantity purchased. The majority of the sales by Evans, Coleman & Evans, Ltd., are at $66; some at other prices are explained by the customers being large quantity purchasers or by a difference in delivery charges, but some of the variations in prices remain unexplained. For instance, on March 24, 1941, the Canadian Robert Dollar Co., Ltd., purchased 1,500 bricks at $70 and on March 31 it purchased 2,000 at $66.

The McCleery & Weston, Ltd., sales run as follows:

> To Canadian White Pine Co. at $63
> To G. H. Anderson at $65
> To Eburne Saw Mills at $66
> To North American Lumber Co. at $66
> To Alberta Lumber Co., mostly at $65
> To Bloedel, Stewart & Welch at $65
> To Huntting-Merrit Shingle Co. at $67
> To Homalko Logging Co., Ltd. at $66

The Champion & White, Ltd., sales run as follows:

To Royal City Saw Mills Ltd. at $60.85 ("Lower price quoted acct shorter haul, 18 miles nearer factory than Vancouver").

To Thurston Flavelle Ltd. at $62 ("Lower prices quoted account delivery point fifteen miles nearer to Clayburn Co.'s factory").

To Vancouver B. C. School Board at $65.

Gilley Bros., Ltd., sales run as follows:

To Canadian Western Lumber Co. Ltd. at $64.

To Mohawk Lumber Co. at $64 and $66, (the latter when $2 was added for extra cartage).

To Timberland Lumber Co. at $68 ("Small quantity ex Gilley Bros. stock, $4 per M added").

To Pacific Shingle Co. at $65 ($1 extra delivery charge to Port Moody).

To sum up, it may be said that the Evans, Coleman & Evans, Ltd., price was $66 with variations; the McCleery & Weston, Ltd., price depended upon the purchaser; the Champion & White, Ltd., price was $65 with variations dependent upon the haul; and the Gilley Bros., Ltd., price was $64 with variations dependent upon the haul.

This analysis indicates that there is no way in which a price for this merchandise can be found. A single uniform price to all purchasers must be established in order to find dutiable value. See *United States* v. *M. Minkus, supra,* where the court said (p. 388):

It is clear from the language of section 402 (b), *supra,* and from the authorities hereinbefore referred to, that the Congress *did not contemplate* that there should be *more than one market value or price for* "such or similar" imported merchandise at the same time. A holding to the contrary might, and probably would, result in imported merchandise, identical in character, sold to different purchasers in the principal markets of the country of exportation, exported at the same time, "if subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof" (section 503), being subjected not only to different amounts of duty, but also in some instances, to different rates of duty, even though the costs of containers, coverings, and other costs, charges, and expenses "incident to placing" such "merchandise in condition, packed ready for shipment to the United States" were the same. [Italics quoted.]

The facts in the instant case are somewhat similar to those in *United States* v. *Mexican Products Co.,* 28 C. C. P. A. 80, C. A. D. 129, where the merchandise was sold at varying discounts depending upon the status of the purchaser or his bargaining ability. It was held that although the major portion of sales was made at the list prices less discounts, the merchandise was not freely offered to all purchasers at other than the list prices; therefore, the list prices were held to be the dutiable values.

In the instant case, even the lists of prices cannot be used to find dutiable value, since the prices quoted are not uniform. On the record as it now stands, it is impossible to find foreign value for squares.

In the case of soaps, there were 14 sales of 200 pieces, the usual wholesale quantity. Two of these were at $61.85, one at $62, one at $63, four at $64, four at $66, one at $66.30, and one at $67.

Again an examination of all the sales in wholesale quantities indicates that the variations did not depend upon quantity purchased; that the majority of sales by Evans, Coleman & Evans, Ltd., were at $66; that McCleery & Weston, Ltd., sold to Canadian White Pine Co. at $63 and to others at $66; that sales by Champion & White, Ltd., were at $61.85 and $62; that Gilley Bros., Ltd., sold at $64 plus delivery charges where the merchandise was delivered to the customer's destination.

As in the case of squares, no foreign value can be found on this evidence.

In the case of end wedges, there were 11 sales in quantities of 1,000 pieces, the usual wholesale quantity. Two of these were at $62, two at $63, one at $64, two at $65, and four at $66. The sales at $66 were by Evans, Coleman & Evans, Ltd., but the following notations of Mr. Wager appear on the exhibits in connection with these sales:

> Cartage ex stock to loading steamship dock Vancouver, B. C. $2.50.
>
> Cartage $3.00 added account delivery from stock.
>
> Vancouver cartage—$2.75 per M from Evans, Coleman & Evans stock.
>
> Ex stock of Evans, Coleman & Evans.

The sales by McCleery & Weston, Ltd., were at $63 to Canadian White Pine Co. and at $65 to others; the sales of Champion & White, Ltd., were at $62; and those of Gilley Bros., Ltd., at $64.

An examination of all of the sales of end wedges regardless of quantity again indicates that the variations in price do not depend upon the quantity sold; that the sales by Evans, Coleman & Evans, Ltd., vary considerably, some being Clayburn factory prices plus freight charges and others being at higher or lower prices depending upon the haul; that McCleery & Weston, Ltd., sold to Canadian White Pine Co. at $63 and to others at $65 and $66; that Champion & White, Ltd., sold at $61.85 and $62; and that Gilley Bros., Ltd., sold at $64.

There are 25 sales of splits in quantities of 200 pieces, the usual wholesale quantity. One sale is at $61.85, one at $63, eight at $64, eight at $66, two at $66.30, one at $66.90, three at $67, and one at $71.30. Sales by Evans, Coleman & Evans, Ltd., were at $66, except to Alberni Pacific Lumber Co., which was charged prices based on Clayburn factory prices plus freight to Port Alberni, and to B. C. Plumbing Supplies, which was given a dealer's price. A sale by McCleery & Weston, Ltd., was at $63 to Canadian White Pine Co. "plus delivery from McCleery & Weston stock $3.00 per M" and one at $66 to Elburne Saw Mills. The only sale by Champion & White, Ltd., of 200 pieces was at $61.85. Sales by Gilley Bros., Ltd., were at $64 plus additional charges for cartage or for "shapes to straights."

An examination of all the sales of splits indicates that the variations did not depend upon quantity; that the majority of the sales by Evans, Coleman & Evans, Ltd., were at $66 except in special circumstances; that the sales by McCleery & Weston, Ltd., were at $63 to Canadian White Pine Co., at $65 to G. H. Anderson, and at $66 to others; that Champion & White, Ltd., sold at $61.85 and $62; that Gilley Bros., Ltd., sold at $64 and $66 plus additional charges for cartage in some cases.

In the case of side arches, there were nine sales of 200 pieces, the usual wholesale quantity, one at $61.85, one at $64, four at $65, and three at $66. Evans, Coleman & Evans, Ltd., sold at $66; McCleery & Weston, Ltd., at $65; Champion & White, Ltd., at $61.85; and Gilley Bros., Ltd., at $64.

An examination of all the sales of side arches shows that the majority of sales by Evans, Coleman & Evans, Ltd., were at $66; that the sales by McCleery & Weston, Ltd., were at $63, $65, $66, and $67; that sales by Champion & White, Ltd., were at $61.85 and $62; that sales by Gilley Bros., Ltd., were at $64 plus delivery charges in some instances.

There were 10 sales of small X-blocks in quantities of 200 pieces, the usual wholesale quantity. Two of these were at $88.20, one at $90, two at $93, two at $100, one at $104, and two at $120. The following explanations appear in Mr. Wager's notations in connection with these sales: The sale at $104 was based on Clayburn factory prices plus freight to Red Gap; the sales at $100 were dealers' prices given on account of the large quantity of other purchases; the price of $88.20 was a lower price on account of a shorter haul; the sales at $93 included $3 for extra cartage. Two sales, one at $120 by McCleery & Weston, Ltd., and one at $90 by Gilley Bros., Ltd., are not covered by any notations. One sale, by Evans, Coleman & Evans, Ltd., to Canadian Robert Dollar Co., Ltd., is listed by Mr. Wager at $12 per M (plaintiff's collective exhibit 2, page 39) and is explained as a "small quantity & hurriedly delivery price." However, the carbon copy of the original invoice (defendant's collective exhibit 18-E) indicates that the sale was at $120 per M.

An examination of all the sales of small X-blocks indicates that they were sold by Evans, Coleman & Evans, Ltd., at prices ranging from $100 to $120; that some of the prices were dealers' prices and some were Clayburn factory prices plus freight; that McCleery & Weston, Ltd., sold at $120; that Champion & White, Ltd., sold at $88.20 and $86; that Gilley Bros., Ltd., sold at $90 plus cartage charges in some cases.

There was only one sale of necks at $61.25 by Evans, Coleman & Evans, Ltd., at the Clayburn factory price plus freight to Port Moody.

There were six sales of end skews; three at $72.50, one at $61.85, one at $61.25, and one at $70.

There were five sales of tongue-and-grooves, two at $70 and three at $69.

After careful consideration of the entire record herein, I conclude that no foreign value for the various articles can be found on the evidence presented. Plaintiff has the burden not only of overcoming the presumption of correctness attaching to the appraiser's valuation but also of proving the correct dutiable value. *United States* v. *Malhame & Co.*, 19 C. C. P. A. 164, T. D. 45276; *Harry Garbey* v. *United States*, 24 C. C. P. A. 48, T. D. 48332. It has been conceded by both parties that no export value exists and there is no evidence in the record as to United States value or cost of production. Since the plaintiff has failed to prove the correct dutiable value of the merchandise, I would be constrained to find the dutiable value of the merchandise on the basis of the appraised values. However, the appraised values were based upon the Clayburn factory price and it has been held by this court and affirmed by the Court of Customs and Patent Appeals that the Clayburn Co., Ltd., did not freely offer the merchandise to all purchasers in the usual wholesale quantities and in the ordinary course of trade and that the Clayburn price was not acceptable as the basis of dutiable foreign value. Since the Court of Customs and Patent Appeals has directed this court to find the usual wholesale quantities and the prices at which the various articles were freely offered for sale to all purchasers in such quantities, and since I am unable to find such prices, I direct that the case be restored to the calendar so that proof may be offered to enable the court to make the required findings.